1:16 MJ 9198

## AFFIDAVIT

I, Shaun C. Moses, Special Agent of the Drug Enforcement Administration (DEA), Cleveland, Ohio, hereinafter referred to as "Affiant," being first duly sworn, depose and state as follows:

### INTRODUCTION

1.   I am currently employed as a Special Agent of the U.S. Drug Enforcement Administration (DEA) and have been so since June of 2005.  I have been assigned to the Drug Enforcement Administration Cleveland Resident Office (CRO) since October of 2005.

2.   Consequently, I am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3.   I am currently assigned to the Cleveland Resident Office of DEA where I have participated in investigations targeting individuals and organizations involved in drug trafficking offenses in the Northern District of Ohio and elsewhere.  At all times during the investigation described

herein, I have been acting in an official capacity as a Special Agent with the DEA.

4.     This Affidavit is submitted in support of an application for a warrant under 18 U.S.C. 2703(a) and Rule 41, Federal Rules of Criminal Procedure, to require Verizon Wireless, a communications service provider, to disclose the contents of stored electronic communications, to wit, text messages, to and from a black Verizon/Samsung "flip" phone, telephone number (213) 266-1055, Mobile Equipment Identifier (MEID HEX) A00000475EBFD1, (hereinafter, the Target Telephone) subscriber information unknown, which was seized from a hotel room occupied by Alejandro NAVARRO-GAYTAN and Antonio COTA-LUNA, concerning violations of:  Title 21, United States Code, Section 841(a)(1), Distribution of Controlled Substance(s) (Cocaine); Title 21, United States Code, Section 843(b), Unlawful Use of a Communication Facility; and Title 21, United States Code, Section 846, Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substance(s) (Cocaine).

## **TRAINING AND EXPERIENCE**

5.     As part of my training with the DEA, I have received specialized instruction about narcotics, narcotics trafficking, money laundering and various techniques for investigating persons and organizations engaged in this unlawful conduct.

During the past seven years, I have participated in investigations involving the organized distribution of illegal drugs and have made hundreds of arrests for drug-related offenses.

6.    My experience as a DEA Special Agent includes, but is not limited to: physical and electronic surveillance, conducting state and federal Title III wiretap investigations, analyzing pen register and telephone toll data, analyzing financial records, interviewing witnesses, drafting and executing search warrants seeking seizure of illegal drugs and other evidence of drug violations, supervising the purchases of controlled substances by undercover agents and confidential sources, and debriefing persons arrested and convicted of drug trafficking offenses about their illegal activity.

7.    Through investigation and training, I have become familiar with the types and amounts of profits made by drug dealers and the methods, language, and terms that are used to disguise their illegal activity.

8.    Based upon my training and experience, I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers.  Continued access to cellular telephones (traditional and pre-paid) and text messaging is crucial to the success of

drug traffickers. Further, I know that wholesale narcotics distributors will frequently use more than one source of supply in order to obtain the lowest price and/or to maintain a steady supply of narcotics. Many times, professional drug distributors provide drugs to associates on credit and receive payment once the drugs are sold, a practice known as "fronting."

9. Based upon my training and experience, I know that drugs are generally stored at varied, and highly secret, locations to avoid seizure and theft. Payment for drugs usually occurs at quickly arranged meetings and at various locations separate from those used to store the drugs. Telephonic contact is therefore required to coordinate and conduct the ongoing illegal narcotics transactions.

10. The cellular telephone enables the professional drug dealer to maintain constant contact with associates, drug suppliers and customers. Recently, drug trafficking organizations (DTOs) have been using cellular telephone text messaging features to communicate with associates relating to the logistics of their drug trafficking business. Affiant is also aware that more and more DTOs are using pre-paid telephones, which require little or no subscriber information, to avoid law enforcement detection and interception.

11. Affiant also knows that those involved in illegal drug operations or other criminal conduct almost always use slang or

code(s) when communicating about their activity, and frequently subscribe to telephones in the names of others, or in completely false names, in an attempt to conceal their identities and illegal actions.

12. Affiant further knows that drug traffickers frequently launder drug profits by purchasing assets. In sophisticated drug trafficking enterprises, real or sham businesses or real estate transactions are used to "clean" the proceeds of the drug operation. Based upon training and experience, I know this illegal activity is often facilitated by telephonic communication.

## PROBABLE CAUSE

13. On the afternoon of September 2, 2016, Affiant received information from colleagues at the DEA Imperial County (California) Resident Office concerning a possible delivery of narcotics or pickup of narcotics-related proceeds, which was to take place in Cleveland, Ohio area on September 3, 2016. Specifically, Affiant learned that a 2009 International Pro Star semi-tractor, bearing California license plate WP85706, which was hauling a 2005 Wabash semi-trailer, bearing California license plate 4NY7322, was in the Baltimore, Maryland area and was slated to come to Ohio during the early morning hours of September 3, 2016 in order to complete the transaction.

Investigators also learned that the transaction was to take place at 17877 St. Clair Avenue, Cleveland, Ohio.

14.  On September 2, 2016, at approximately 4:30 a.m., investigators assigned to the DEA Cleveland Resident Office (CRO) established surveillance in the area of 17877 St. Clair Avenue, Cleveland, Ohio.  At approximately the same time, CRO investigators located and initiated surveillance on the above-referenced tractor, which was traveling westbound on the Ohio turnpike.  Investigators at 17877 St. Clair Avenue observed the property to be a large commercial building, with a fenced in lot on the west end of the building, which contained numerous tractor trailers.  Investigators also noted that the lot, while fenced in, was open and easily accessible to the public.

15.  At approximately 5:11 a.m., investigators at 17877 St. Clair Avenue observed a small Nissan sedan, bearing Ohio license plate GFY 9904, pull into the above-referenced parking lot.  The vehicle appeared to circle around the parking lot for a short time as if the occupants were looking for something or someone, after which the vehicle departed.  It appeared to Affiant and other investigators that the occupants of the vehicle were likely conducting counter-surveillance, or looking for the driver of the aforementioned tractor trailer, which had not yet arrived at the parking lot.  After the vehicle departed the parking lot, investigators confirmed the license plate of the

vehicle, and a check of the vehicle's registration revealed that it was a rental car. Investigators followed the vehicle for a short time and observed individuals later determined to be ANTONIO NAVARRO-GAYTAN and ALEJANDRO COTA-LUNA as the driver and passenger of the vehicle, respectively.

16. At approximately 5:20 a.m., the above-referenced tractor trailer pulled into the parking lot of 17877 St. Clair Avenue, where investigators watched it back in and park amongst the other tractor trailers already parked in the parking lot.

17. At approximately 5:47 a.m., investigators observed the Nissan sedan, bearing Ohio license plate GFY 9904, and occupied by NAVARRO-GAYTAN and COTA-LUNA, pull back into the parking lot of 17877 St. Clair Avenue. The vehicle then pulled up next to the driver's side of the above-referenced tractor trailer, and the occupants of the Nissan sedan appeared to talk with the driver of the tractor trailer. Shortly thereafter, the Nissan sedan pulled toward the back of the parking lot, and then out near the street in front of the parking lot, before again pulling toward the back of the parking lot with the tractor trailer following. Both vehicles then pulled behind the building, and continued eastbound along the rear of the building until they reached the very end of the fenced in lot behind the building. This location was the furthest one could drive in the

rear of the lot, and in Affiant's experience, offered the most
possible privacy for the Nissan sedan and the tractor trailer.

18.  For several minutes, Affiant watched as the driver of
the tractor trailer maneuvered the trailer behind the building.
At approximately 6:04 a.m., investigators observed the trailer
being unhooked from the tractor, after which the tractor
departed the parking lot, and headed eastbound on St. Clair
Avenue.  Investigators then watched as NAVARRO-GAYTAN and COTA-
LUNA appeared to work underneath the front of the trailer.
After appearing to work under the trailer for several minutes
with flashlights, NAVARRO-GAYTAN and COTA-LUNA opened the trunk
of the Nissan sedan and appeared to be taking items back and
forth between the trunk and the area of the secret compartment
underneath the trailer.

19.  At approximately 6:30 a.m., NAVARRO-GAYTAN and COTA-
LUNA departed the parking lot in the Nissan sedan.  The two
traveled directly to the Speedway gas station located at 18501
Nottingham Road, Cleveland, Ohio.  Upon pulling into the gas
station, NAVARRO-GAYTAN parked the Nissan near one of the gas
pumps, however neither individual exited the vehicle for several
minutes.  At approximately 6:37 a.m., investigators observed
NAVARRO-GAYTAN out of the vehicle and it appeared that he was
checking to ensure that both of his headlights were working
properly.  After NAVARRO-GAYTAN returned the vehicle, he pulled

away from the gas pumps and parked in a parking space within the
Speedway lot.  NAVARRO-GAYTAN and COTA-LUNA proceeded to sit in
the vehicle for over 10 minutes, before finally departing at
approximately 6:52 a.m.  After departing the Speedway gas
station, NAVARRO-GAYTAN and COTA-LUNA headed westbound on
Interstate 90.

 20.  At approximately 6:56 a.m., Ohio State Highway Patrol
Trooper Tim Timberlake initiated a traffic stop of the Nissan
Sentra for speeding, as the vehicle was traveling 71 mph in a 60
mph zone.  Upon approaching the vehicle, Trooper Timberlake
identified the driver of the vehicle to be Antonio NAVARRO-
GAYTAN (via Gaytan's Mexican driver's license), and the
passenger to be Antonio COTA-LUNA (via a Mexican voting card and
U.S. border crossing card).  Upon approaching the vehicle,
Trooper Timberlake explained the reason for the stop, after
which Gaytan and Luna presented their identification.  Trooper
Timberlake subsequently removed both individuals from the
vehicle and separated them.  Trooper Timberlake noted that
NAVARRO-GAYTAN appeared extremely nervous, and would not make
eye contact with Trooper Timberlake.  Trooper Timberlake also
observed that COTA-LUNA would also look away whenever he would
answer one of Trooper Timberlake's questions.  Upon separately
questioning the two what they were doing, NAVARRO-GAYTAN stated
that they were coming from their hotel and going to Wal Mart,

while COTA-LUNA stated that they were coming back from looking at a piece of equipment they were going to buy, and going back to their hotel.

21.   During the traffic stop, Trooper Chad Schell deployed his narcotics-trained canine, Jimmy, for an open air sniff of the exterior of the vehicle.  Trooper Schell advised that canine Jimmy alerted to the presence of the odor of narcotics emanating from the trunk of the vehicle.  A subsequent probable cause search of the vehicle revealed a large, black Rubbermaid bin, as well as a brand new green duffel bag, which contained a brand new in the package head lamp and screwdriver set, a roll of blue shop towels, two Wal Mart bags full of greasy shop towels and greasy rubber gloves, as well as a new pack of rubber gloves, a torque bit and two mini pry bars, both of which had grease on them.  Toward the conclusion of the traffic stop, Trooper Timberlake noted that COTA-LUNA had a significant amount of grease on his pants.  When Trooper Timberlake asked COTA-LUNA about the origin of the grease, COTA-LUNA simply smiled and returned to his vehicle.  Affiant believed the presence of greasy gloves, rags and tools, as well as the grease on COTA-LUNA, is all indicative of COTA-LUNA opening, or attempting to open, and then re-sealing the secret compartment that Affiant believed was under the 2005 Wabash semi-trailer, bearing California license plate 4NY7322.

22.  During the traffic stop, troopers also observed a parking pass for a Doubletree hotel and a rental agreement in NAVARRO-GAYTAN's name for the Nissan sedan showing that it was rented near Cleveland Hopkins International Airport on August 31, 2016, and was due back on September 4, 2016.  Troopers also observed and photographed a ledger that was located in the center console of the vehicle.  While the writings in the ledger were almost exclusively in Spanish, the troopers did note one page which contained the address 17877 St. Clair Avenue, Cleveland, Ohio 44110.

23.  A check of law enforcement databases also revealed that on April 26, 2010, Antonio NAVARRO-GAYTAN was stopped attempting to cross the border from Mexico to the United States while driving a tractor trailer containing cement patio furniture.  Within the load of furniture, approximately 19 kilograms of marijuana was discovered, however prosecutors declined to charge NAVARRO-GAYTAN.

24.  After NAVARRO-GAYTAN and COTA-LUNA were released from the scene of the traffic stop, investigators converged on the 2005 Wabash semi-trailer, bearing California license plate 4NY7322, which was still parked in the lot at 17877 St. Clair Avenue, Cleveland, Ohio.  Upon looking underneath the front of the trailer, investigators located what they believe to be a

secret compartment, approximately one foot by one foot, which appeared to have been recently covered with fresh grease.

25.  On September 3, 2016, at approximately 11:18 a.m., the Honorable Judge Timothy P. McCormick, Cuyahoga County Court of Common Pleas, signed a search warrant authorizing the search of the 2005 Wabash semi-trailer, bearing California license plate 4NY7322, which was parked at 17877 St. Clair Avenue, Cleveland, Ohio.  Within approximately ten minutes, agents began the search of the trailer and located 92 rectangular bricks, approximately kilogram-sized, wrapped in black plastic concealed within an aftermarket compartment on the underside of the trailer.  SAs Sean O'Malley and Rande Reinhard conducted field tests of a white powdery substance contained within two of the bricks, with positive results for the presence of cocaine.  As the search warrant was being executed, investigators maintained surveillance on NAVARRO-GAYTAN and COTA-LUNA's rented Nissan sedan, which had been located at the Doubletree by Hilton, 10660 Carnegie Avenue, Cleveland, Ohio.  Investigators subsequently determined, with the assistance of hotel management, that room 711 had been rented by COTA-LUNA on August 31, 2016.

26.  After the discovery of the suspected kilograms of cocaine, investigators arrested NAVARRO-GAYTAN and COTA-LUNA inside room 711 of the Doubletree by Hilton, located at 10660 Carnegie Avenue, Cleveland, Ohio.  Subsequent to the arrest of

NAVARRO-GAYTAN and COTA-LUNA, investigators executed a search warrant inside their hotel room, and recovered four cellular telephones.  NAVARRO-GAYTAN and COTA-LUNA declined to make statements at the time of their arrest.

27.  Later on September 3, 2016, Affiant applied for and obtained a state search warrant for the four cellular telephones that were seized from NAVARRO-GAYTAN and COTA-LUNA's hotel room. Upon execution of that search warrant by SA Paul Stroney, SA Stroney observed that three of the four cellular telephones were password protected, but that the fourth, the Target Telephone, was not.  An inspection of that phone revealed that contained on the phone were numerous text messages, which were in Spanish. SA Stroney subsequently translated several of the messages and determined that they were drug-related, and at that time, served a preservation request on Verizon Wireless to preserve any and all text messages that they were in possession of.

28.  On September 6, 2016, Affiant appeared before U.S. Magistrate Judge William H. Baughman, Jr. for the purpose of obtaining a search warrant for the aforementioned Nissan sedan, which was seized subsequent to the arrest of NAVARRO-GAYTAN and COTA-LUNA on September 3, 2016.  After obtaining a search warrant for the vehicle, investigators conducted a thorough search, and located and seized a small notebook which was observed by Ohio State Highway Patrol Troopers when they

searched the vehicle during the above-referenced traffic stop of
NAVARRO-GAYTAN and COTA-LUNA on September 3, 2016.  Upon
inspection of the notebook, it became clear that several pages
of the notebook were the keys to multiple alphanumeric codes,
where a particular number corresponded to a particular letter of
the alphabet.

29.  Some examples of the drug-related text messages
contained on the Target Telephone include, but are not limited
to, on September 3, 2016, at approximately 5:38 a.m., the Target
Telephone received an incoming text message from Mexican phone
number 52-6531143127, "Aserkate y dile q eres el
557861727855721666".  This message, when translated and the code
key applied to the numerals, means "Get closer and tell him that
you are the engineer."  (With the word "engineer" being
alphanumerically coded)  Nine minutes later, at approximately
5:47 a.m., and as outlined in paragraph 17, above, investigators
observed a NAVARRO-GAYTAN and COTA-LUNA pull back into the
parking lot of 17877 St. Clair Avenue, speak to the driver of
the tractor trailer, and then lead the tractor trailer behind
the building.  Affiant believes that this text message
represents an unknown individual telling NAVARRO-GAYTAN and
COTA-LUNA to go back to the parking lot at 17877 St. Clair
Avenue, and tell the truck driver that one of them was the

"engineer," meaning the person who would be extracting the contents of the secret compartment in the trailer.

30. At approximately 6:49 a.m., while NAVARRO-GAYTAN and COTA-LUNA sat at the Speedway gas station, the Target Telephone received an incoming text message from 52-6531143127, which stated "Me estan disiendo q es con yave I no con desarmador", which translates roughly to "They're telling me that it's with L key not with screwdriver." At approximately 6:55 a.m., just before NAVARRO-GAYTAN and COTA-LUNA were pulled over by Ohio State Highway Patrol Troopers, the Target Telephone received an incoming text message from 52-6531143127, which stated "Yaves alen me dijo", which translates roughly to "allen keys they told me." These text messages are significant because the secret compartment in the tractor trailer was secured with numerous allen-head bolts. It is Affiant's belief that NAVARRO-GAYTAN and COTA-LUNA left from 17877 St. Clair Avenue because they were unable to access the secret compartment beneath the semi trailer and extract some of all of the kilograms of cocaine as planned. Affiant further believes that the incoming text messages detailed in this paragraph represent an individual trying to help NAVARRO-GAYTAN and COTA-LUNA understand what type of tools they needed to open up the secret compartment.

## CONCLUSION

31. Based on the foregoing, Affiant alleges that there is

probable cause to believe that Antonio NAVARRO-GAYTAN and Alejandro COTA-LUNA have committed and is committing offenses in violation of 21 U.S.C. 841(A)(1) and 846, to include possession of controlled substances with intent to distribute, distribution of controlled substances, unlawful use of a communications facility and conspiracy to distribute controlled substances; that there is probable cause to believe Antonio NAVARRO-GAYTAN and Alejandro COTA-LUNA were using the Target Telephone to facilitate their drug trafficking activity; and that there is probable cause to believe that text message records, as further described in Attachment A and Attachment B hereto, are currently being stored on the Target Telephone, which constitute evidence of the foregoing target offenses.  Consequently, Affiant seeks a warrant, pursuant to the provisions of 21 U.S.C. 2703(a) and Rule 41, Federal Rules of Criminal Procedure, to require the disclosure of same by Verizon Wireless, a communications service provider. The request is further described in Attachments A and B.

_____

Shaun C. Moses
Special Agent
U.S. Drug Enforcement Administration

This and the preceding 16 pages were sworn to and subscribed before me this 8th day of September, 2016.

_____  1:02 p.m.

Time

_____

Honorable William H. Baughman, Jr.
U.S. Magistrate Judge
Northern District of Ohio
Eastern Division